**Case No. 24-13713-H**

---

**In the United States Court of Appeals for the Eleventh Circuit**

**T-Mobile South, LLC**
**Plaintiff – Appellee**

**v.**

**City of Roswell, Georgia**
**Defendant - Appellant**

---

Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division
Case No. 1:10:cv-01464-AT

---

**BRIEF OF**
**APPELLANT CITY OF ROSWELL, GEORGIA**

---

Richard A. Carothers
Angela C. Couch
CAROTHERS & MITCHELL, LLC
1809 Buford Highway
Buford, GA  30518
Attorneys for Appellant
(770) 932-3552
(770) 932-6348 Fax
richard.carothers@carmitch.com
angela.couch@carmitch.com

*Docket No. 24-13713-H*
*T-Mobile South LLC v. City of Roswell, Georgia*

## APPELLANT CITY OF ROSWELL'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26-1(a), the following is a complete list of trial judges, attorneys, persons, associations, firms, partnerships, or corporations that have an interest in the outcome of this particular case:

1.   Arnall, Golden, Gregory, LLP – Firm representing Plaintiff/ Appellee.

2.   Barr, Tucker, J. – Attorney for Plaintiff/ Appellee T-Mobile South, LLC.

3.   Carothers & Mitchell, LLC – Firm representing Defendant/ Appellant City of Roswell, Georgia.

4.   Carothers, Richard A. – Attorney for Defendant/ Appellant City of Roswell, Georgia.

5.   City of Roswell, Georgia – Appellant/ Defendant.

6.   Couch, Angela C. – Attorney for Defendant/ Appellant City of Roswell, Georgia.

7.   Mintz, Levin, Cohn, Ferris, Glovsky and  Popeo, P.C. – Firm representing Plaintiff/Appellee T-Mobile South, LLC.

8.    Taylor, Scott E. – Attorney for Plaintiff/ Appellee T-Mobile South, LLC.

9.    Thompson, T. Scott - Attorney for Plaintiff/ Appellee T-Mobile South, LLC.

10.    T-Mobile South, LLC – Plaintiff/Appellee is a Delaware limited liability company and wholly owned subsidiary of T-Mobile USA, Inc. T-Mobile USA, Inc., a Delaware corporation, is a wholly-owned subsidiary of T-Mobile US, Inc., a Delaware corporation. T-Mobile US, Inc. (NASDAQ: TMUS) is a publicly-traded company listed on the NASDAQ Global Select Market of NASDAQ Stock Market LLC ("NASDAQ"). Deutsche Telekom Holding B.V., a limited liability company (besloten vennootschap met beperkte aansprakelijkheidraies) organized and existing under the laws of the Netherlands ("DT B.V."), owns more than 10% of the shares of T-Mobile US, Inc. DT B.V. is a direct wholly-owned subsidiary of T-Mobile Global Holding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Holding"). Holding, is in turn a direct wholly-owned subsidiary of T-Mobile Global Zwischenholding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of

*Docket No. 24-13713-H*
*T-Mobile South LLC v. City of Roswell, Georgia*

Germany ("Global"). Global is a direct wholly-owned subsidiary of Deutsche Telekom AG, an Aktiengesellschaft organized and existing under the laws of the Federal Republic of Germany ("Deutsche Telekom"). The principal trading market for Deutsche Telekom's ordinary shares is the trading platform "Xetra" of Deutsche Börse AG. Deutsche Telekom's ordinary shares also trade on the Frankfurt, Berlin, Düsseldorf, Hamburg, Hannover, München and Stuttgart stock exchanges in Germany. Deutsche Telekom's American Depositary Shares ("ADSs"), each representing one ordinary share, trade on the OTC market's highest tier, OTCQX International Premier (ticker symbol: "DTEGY"). Additionally, SoftBank Group Corp. owns more than 10% of the shares of T-Mobile US, Inc. Masayoshi Son owns more than 10% of SoftBank Group Corp.

11.    Totenberg, Amy – United States Court District Judge.

I hereby certify that I am unaware of any additional publicly traded companies that have an interest in this appeal other than the companies listed above.

*(signature on following page)*

*Docket No. 24-13713-H*
*T-Mobile South LLC v. City of Roswell, Georgia*

Respectfully submitted, this 30th day of January, 2025.

CAROTHERS & MITCHELL, LLC

*/s/ Angela C. Couch*

_____
ANGELA C. COUCH
Georgia Bar No. 190005
Attorney for Appellant City of Roswell,
Georgia

1809 Buford Highway
Buford, GA  30518
(770) 932-3552
(770) 932-6348 Fax
Email: angela.couch@carmitch.com

## STATEMENT REGARDING ORAL ARGUMENT

The City of Roswell, Georgia (the "City") respectfully requests oral argument in this matter, as the primary issue on appeal is a matter of first impression in this Circuit. The issue at bar is whether the City's denial of T-Mobile South, LLC's application for a cell tower prohibited or had the effect of prohibiting the provision of personal wireless services in violation of 47 U.S.C. §332(c)(7)(B)(i)(II) of the federal Telecommunications Act of 1996 ("TCA"). In no case has this Court definitively construed and then applied the language of the TCA to determine what constitutes an effective prohibition of wireless services. This being a matter of first impression, oral argument provides a greater opportunity to explore and address what the language requires a claimant to prove to demonstrate a violation of this section of the TCA.

This case also involves entry of a permanent injunction requiring the City to issue all necessary permits and approvals for the cell tower to T-Mobile South, LLC ("T-Mobile"). The TCA generally preserves the traditional authority of local governments to regulate the location, construction, and modification of facilities like cell towers, and oral argument would allow a full discussion of how the imposition of the injunction in this case runs afoul of the TCA's direction in that regard.

i

# JURISDICTIONAL STATEMENT

The claim asserted by T-Mobile against the City is brought under 47 U.S.C. §332(c)(7)(B)(i)(II) of the TCA wherein T-Mobile alleges that the City's decision to deny its request for a permit to erect a cell tower constitutes an effective prohibition of wireless services.  Section 332(c)(7)(B)(v) allows T-Mobile to pursue its claim in federal court. The District Court had subject matter jurisdiction under 28 U.S.C. §1331.

This appeal arises from the District Court's order issuing a permanent injunction against the City and the entry of judgment in favor of T-Mobile which constitutes a final decision on T-Mobile's claim in this case. This Court has appellate jurisdiction under 28 U.S.C. §1291.

On October 18, 2024, the District Court issued its Order granting T-Mobile's request for injunctive relief (Doc. 392), and the Clerk thereafter entered Judgment in favor of T-Mobile (Doc. 393).  The City timely filed its Notice of Appeal on November 7, 2024. (Doc. 394).

## **TABLE OF CONTENTS**

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT** . . . . . . . . . . . . . . . . . . C-1 - C-4

**STATEMENT REGARDING ORAL ARGUMENT** . . . . . . . . . . . . . . . . . . . . i

**JURISDICTIONAL STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**TABLE OF CITATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-vi

**STATEMENT OF THE ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-10

    A. Course of Proceedings and Disposition in the Court Below . . . . . . . . 1-2

    B. Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-10

    C. Statement of the Standard for the Scope of Review . . . . . . . . . . . . . . 10

**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

**ARGUMENT AND CITATIONS OF AUTHORITY** . . . . . . . . . . . . . . . . . 11-28

    A. The District Court Erred in its Determination of a
       Significant Gap. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-23

    B. The District Court Erred in Determining the Proposed Tower
       Was the Least Intrusive Means to Address any Alleged Gap
       in Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-28

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

**CERTIFICATE OF COMPLIANCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## <u>TABLE OF CITATIONS</u>

**CASES**

360° Communications Co. of Charlottesville v. Board of Supervisors
of Albemarle County
211 F.3d 79 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

American Towers, Inc. v. Wilson County
No. 3:10-CV-1196, 2014 WL 28953 (M.D. Tenn. Jan. 2, 2014) . . . . . . . . . . 18-19

AT & T Mobility Servs., LLC v. Village of Corrales
642 F. App'x 886 (10th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Cellco Partnership v. White Deer Township Zoning Hearing Board
609 F. Supp. 3d 331 (M.D. Pa. 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Cellco Partnership v. White Deer Township Zoning Hearing Board
74 F.4th 96 (3d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Cellular South Real Estate, Inc. v. City of Mobile, Alabama
No. CV 15-00387-CG-B, 2016 WL 3746661 (S.D. Ala. July 8, 2016) . . . . . . . . 18

Cellular Telephone Co. v. Zoning Bd. Of Adjustment
197 F.3d 64 (3d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Compulife Software, Inc. v. Newman
111 F.4th 1147 (11th Cir. 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Green Mountain Realty Corp. v. Leonard
688 F.3d 40 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Green Mountain Realty Corp. v. Leonard
750 F.3d 30 (1st Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

Independent Wireless One Corp. v. Town of Charlotte
242 F. Supp. 2d 409 (D. Vt. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18- 19

iv

Industrial Tower & Wireless, LLC v. Haddad
109 F. Supp. 3d 284 (D. Mass. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Liberty Towers, LLC v. Zoning Hearing Board of Falls Township,
Bucks County., Pennsylvania
2011 WL 6091081 (E.D.Pa. Dec. 6, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

MetroPCS, Inc. v. City & County of San Francisco
400 F.3d 715 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Michael Linet, Inc. v. Village of Wellington, Florida
408 F.3d 757 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Omnipoint Holdings, Inc. v. City of Cranston
586 F.3d 38 (1st Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

Orange County– Poughkeepsie Ltd. Partnership v. Town of East Fishkill
632 F. App'x 1 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Powertel/Atlanta, Inc. v. City of Clarkston
No. 1:05–CV–3068, 2007 WL 2258720 (N.D.Ga. Aug.3, 2007) . . . . . . . . . . . . 18

Second Generation Properties v. Town of Pelham
313 F.3d 620 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Sprint Spectrum L.P. v. Willoth
176 F.3d 630 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20, 25

T-Mobile Northeast LLC v. Fairfax County Board of Supervisors
672 F.3d 259 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

T-Mobile Northeast LLC v. Howard County Board of Appeals
No. CIV.A. RDB-11-729, 2012 WL 1123043 (D. Md. Mar. 30, 2012) . . . . . . . . 17

T-Mobile Northeast LLC v. Loudoun County Board of Supervisors
903 F. Supp. 2d 385 (E.D. Va. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

T-Mobile South, LLC v. City of Roswell, Georgia
574 U.S. 293 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>T-Mobile South, LLC v. City of Roswell, Georgia</u>
662 F. Supp. 3d 1269 (N.D. Ga. 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23

<u>Vogue Tower Partners VII, LLC v. City of Elizabethton, Tennessee,</u>
___ F. Supp. 3d ___, 2024 WL 4351425 (E.D. Tn. September 30, 2024) . . . . . 17

**FEDERAL STATUTES**

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

47 U.S.C. § 332(c)(7)(A)-(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

47 U.S.C. § 332(c)(7)(B)(i)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, ii, 1, 13

47 U.S.C. § 332(c)(7)(B)(i)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**RULES**

11th Cir. R. 26.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

## **STATEMENT OF THE ISSUES**

1.    Whether the City violated the "effective prohibition" provision of §332(c)(7)(B)(i)(II) of the TCA in connection with its denial of T-Mobile's application for a cell tower where there was no evidence of a significant gap in personal wireless services in the area without the proposed tower.

2.    Whether the City violated the "effective prohibition" provision of the TCA in connection with its denial of T-Mobile's application for a cell tower where there was evidence that erecting the proposed tower was not the least intrusive means to close any alleged gap in personal wireless services in the area of the proposed tower.

## **STATEMENT OF THE CASE**

### **A.    Course of Proceedings and Disposition in the Court Below**

The first portion of the proceedings in this case are set forth in T-Mobile South, LLC v. City of Roswell, Georgia, 662 F. Supp. 3d 1269, 1274-82 (N.D. Ga. 2023). The City initially denied T-Mobile's application in 2010, and after years of litigation, at the direction of the District Court, the City held another public hearing and vote on July 24, 2017 and issued a written denial of T-Mobile's application on July 31, 2017. (Compliance Notice, Doc. 184; written denial, Doc. 186-13 at 1; meeting minutes, Doc. 211-2 at 16–52).  T-Mobile alleges that this 2017 denial violated the TCA by effectively prohibiting it from providing personal wireless service in the residential

area around the proposed tower.

The District Court denied the parties' subsequent cross-motions for summary judgment and ultimately held an evidentiary hearing/bench trial on July 30, 2024-August 2, 2024. The Court issued its findings of fact and conclusions of law in the October 18, 2024 Order granting T-Mobile's request for injunctive relief and directing the City to issue all necessary permits and approvals and to authorize construction of the proposed cell tower. (Doc. 392). The Clerk thereafter entered judgment in favor of T-Mobile. (Doc. 393).

## B.    <u>Statement of the Facts</u>

T-Mobile wishes to build a new 108' cell tower on a vacant 2.8 acre parcel of land located at 1060 Lake Charles Drive. (Trial Transcript[1], Doc. 384, p. 154). The Lake Charles area is a residential neighborhood with large homes, mature plants and trees, with hilly terrain and no major highways or roads going through the neighborhood. (TT,  Docs. 403-24 to 26, Plf Ex 33 to 35; Doc. 384, p. 200). Since 2017, there have been no significant changes in the area's character, buildings, roads, etc. (TT, Doc. 386, pp. 79, 88). The area has full access to internet service which is used by wireless facilities such as small cells and T-Mobile's Cellspot to communicate

---

[1] The page numbers referenced in the trial transcript is the page number that appears in the header generated by the District Court's electronic filing system.  The abbreviation used for the 2024 trial transcript is "TT."

with the wireless network. (TT, Doc. 387, p. 40-41, 49-51).

There are 30 cell towers in the City of Roswell. (TT, Doc. 387, p. 19). There are 11 towers in the vicinity of the area of the proposed tower. (TT, Doc. 403-3, p. 66). They range in distance away from the proposed tower of 1.1 miles to 4.5 miles. (Id.). T-Mobile co-locates on all of the same towers as Verizon and AT&T. (TT, Doc. 384, pp. 127-128). Recently, a new 170' tower was constructed in a City-owned park approximately two miles from the area of the proposed tower. (TT, Doc. 387, pp. 22-26). Evidence was presented that the tower company and the City expected T-Mobile to locate antennas on this new tower. (TT, Doc. 387, pp. 33, 39; Doc. 404-13). There are 43 small cell facilities in the City of Roswell, with Verizon using six such facilities in the area of the proposed tower. (TT, Doc. 387, p. 40; Doc. 404-14).

T-Mobile uses FCC-issued licenses for five frequency bands in the City: 600 and 700 MegaHertz ("MHz")("low bands") and 1900, 2100, and 2500 MHz frequency bands ("mid bands"). (TT, Doc. 384, p. 60). T-Mobile's expert, Richard Conroy, has served as an expert exclusively for carriers for approximately 20 years, and after conducting drive tests, creating propagation and coverage maps, and analyzing various data, Mr. Conroy determined that in 2024, T-Mobile had a gap in its provision of residential in-building wireless services in an area less than a square mile around the proposed tower. Specifically, he identified a .7 square mile gap in the low bands and

a .9 square mile gap in the mid bands (collectively hereinafter "the alleged gap area"). (TT, Doc. 384, pp. 82-85, 92-94).

Mr. Conroy opines that within the alleged gap area, T-Mobile has "unreliable service." (TT, Doc. 386, p. 62).  Unreliable service, as he uses that term, means the service levels do not meet T-Mobile's assigned levels and goals. (TT, Doc. 403-3, p. 9; Doc. 384, pp. 232-234; Doc. 386, pp. 94-95).  Mr. Conroy testified that unreliable service means customers cannot place calls when they want to; voice call quality does not meet customer expectations; or the call is dropped without notice. (TT, Doc. 403-3, p. 9; Doc. 386, pp. 64-67).  No evidence was presented that even one customer in the alleged gap area could not place a call when desired, had complained about poor voice call quality, or experienced dropped calls.  (TT Doc. 386, pp. 64-67)

In the alleged gap area, T-Mobile has approximately 156 customers. (TT, Doc. 404-27, p. 2).  There are approximately 560 residences in the alleged gap area, and the total population based on the last Census data showed approximately 2300 people in the alleged gap area. (TT, Doc. 387, pp. 18-19).  That Census data also showed the entire City of Roswell has approximately 92,000 residents. (Id.)

Although T-Mobile has access to location-specific data, no evidence was presented about any customer or any resident *in the alleged gap area* being unable to place a call, experiencing poor voice quality or dropped calls. (TT Doc. 386, pp. 64-

67).   The performance indicator percentage evidence presented was not actual numerical data *from the alleged gap area*. (TT, Doc. 386, p. 69-72).  Mr. Conroy testified that if a T-Mobile user in the alleged gap area was having issues with signal quality, that user device will send information to T-Mobile regarding those issues, but he admitted that no such location-specific data was presented in this case. (TT, Doc. 386, p. 29).  Mr. Conroy never spoke to anyone in the alleged gap area about their wireless service experience, and he gathered no customer data specific to the alleged gap area. (TT,  Doc. 386, p. 60).

Mr. Conroy testified that the drive tests of the alleged gap area supported his opinion of a gap in service, but the drive test data as presented was flawed.  Although the equipment used provided precise data, Mr. Conroy's presentation rounded to whole numbers where one decimal place off could make the difference between the designation of "acceptable" coverage, "not acceptable" coverage, or non-coverage. (TT, Doc. 384, p. 231).  Likewise, the drive test equipment provided tower-specific information that would have shown what coverage each of the surrounding towers was providing in the alleged gap area, yet Mr. Conroy did not present that information. (TT, Doc. 384, pp. 226-227).  No models or maps were provided to show any area of the City where T-Mobile was experiencing "acceptable" coverage and signal quality levels so that information could be compared to the alleged gap area. (TT, Doc. 386,

p. 86).

A crowd-sourced, location-specific data gathering method called minimization of drive test ("MDT") can be used to obtain information about signal strength and tower usage for phones located inside buildings. (TT, Doc. 388, pp. 24-26, 51-52). This data can be sued to provide specific coverage maps for particular locations. (Id.). T-Mobile uses MDT, but Mr. Conroy did not use any of that data in this case to provide evidence about the specific level of wireless service in any residential building or in any location within the area of the alleged gap. (TT, Doc. 386, pp. 115-118).

Mr. Conroy's opinion of the existence of a gap in services is based solely on design standards set by T-Mobile, which has changed over the years, as determined by T-Mobile. (TT, Doc. 384, pp. 132, 231-32). There are no industry-wide standards for what level of coverage is "acceptable"; each carrier designates its own thresholds. (TT, Doc. 384, p. 233). Signal strength is measured in decibels per milliwatt ("dBm"). (TT, Doc. 384, p.75). Mr. Conroy testified that the design standards difference for each carrier is minor, "just a few dBm," but he also admitted the difference between acceptable and unacceptable coverage under T-Mobile's chosen standards in the alleged gap area also is just a few dBm. (TT, Doc. 384, pp. 229, 231, 234).

Along with changes in their standards, since 2017, T-Mobile also has changed equipment on the existing towers and made minor adjustments to the downtilt, which is the upward or downward direction of an antenna. (TT, Doc. 384, p. 214; Doc. 386, p. 22). No changes were made to the azimuths, which is the side to side direction of the antenna, and no changes were made to the height of any existing tower. (TT, Doc. 384, p. 167). All of the existing towers are running at optimal power as designated by T-Mobile's engineers. (TT, Doc. 386, p. 17).

In addition to changes in T-Mobile's standards and equipment, since 2017, T-Mobile merged with Sprint, and as a result, it obtained new frequency bands and gained a new tower used in the alleged gap area. (TT, Doc. 384, pp. 90-91). Nevertheless, Mr. Conroy opined that nothing could be done to any existing tower to solve the supposed service problem in the alleged gap area; only a new tower in the proposed location could address the gap. (TT, Doc. 384, pp. 222-224; Doc. 386, pp. 14-16, 31). Indeed, even with the changed standards, the new equipment, the adjustments to the antennas, the new frequency band, and the new tower, Mr. Conroy insisted that coverage in the alleged gap area actually got worse since 2017. (TT, Doc. 384, p. 235). Notably, no evidence was presented that any residents or customers in the alleged gap area were complaining about increased problems in obtaining wireless service. Mr. Conroy's 2017 and 2023 existing coverage maps indeed show worse

coverage. (TT, Doc. 404-5 &. 403-3, p. 206 [700mHz]; Doc 404-6 & 403-3, p. 210 [2100 MHZ]).  However, based on drive tests, the size of the alleged gap area for the 2100 MHZ in 2017 (1.8 square miles) was double in size when compared to the 2024 area (.9 square miles), while the alleged low band 700mHz gap area was smaller in 2017 (.2 square miles) than in 2024 (.7 square miles). (TT, Doc. 404-1, pp. 8-9 [2017]; 403-3, pp. 16-19 [2024]).  No evidence was presented to explain the inconsistency of Mr. Conroy's coverage maps and drive test maps.

With respect to the anticipated coverage the proposed tower would provide, modeling showed the low bands coverage would be 93% of the .7 square mile area, and for the mid bands, the coverage drops to less than half of the alleged gap area – a mere 43%. (TT, Doc. 384, p. 160).  The propagation maps also show that outside of the alleged gap area, new areas of "unacceptable" coverage are created by the proposed tower. (TT, Doc. 404-20).

The City's expert, Ben Levitan, has many years of experience in designing wireless systems. (TT, Doc. 387, p. 104-108).  He analyzed the existing towers and their coverage areas, the alleged gap area, population density, character of the area, and mode of use. (TT, Doc. 388, pp. 15-18, 22-24).  Mr. Levitan opined that there was no gap in service in the less-than-a-square-mile area identified by T-Mobile.  (TT, Doc. 388, p. 32).  He testified that if there were such a gap, antennas on the existing

towers and the power to the towers could be modified to increase coverage in the alleged gap area. (TT, Doc. 388, pp. 40-41).  Mr. Levitan noted that Verizon was using small cells in the alleged gap area and suggested that T-Mobile's CellSpot device could be a viable alternative to the 108' proposed tower. (TT, Doc. 388, p. 41, 47, 50-52).  The CellSpot is a small piece of equipment that functions as a signal booster. (TT, Doc. 388, pp. 50-51).  It is placed in the building where there are problems with coverage and increases the level of wireless service in the building. (TT, Doc. 404-15).

Since 2017, the City switched its wireless contract from Verizon to T-Mobile. (TT, Doc. 387, p. 55).  Leading up to the transition, T-Mobile presented information to the City showing sufficient coverage would be provided to the City staff throughout the City, including police and fire. (TT, Doc. 387, p. 44; Doc. 404-16).  Safety being a primary concern, the City did its own field testing and worked with T-Mobile to confirm good coverage throughout the City, including in the alleged gap area. (TT, Doc. 387, pp. 47-49).  In the few instances where the City raised issues about in-building coverage, T-Mobile offered its CellSpot as a part of its service to boost the coverage in the concerned building. (TT, Doc. 387, pp. 50-52; Doc. 404-17; Doc. 404-18).

The City's assistant city administrator testified that he lived in an area shown

9

on T-Mobile's coverage maps as having "unacceptable" in-building coverage. (TT, Doc. 387, p. 57). He was provided a city-issued T-Mobile phone to use in his home, and when he raised an issue with the City concerning poor service in his house, he was provided a CellSpot. (TT, Doc. 387, pp. 57-58). Once installed, the CellSpot provided continuous, seamless in-building coverage with no signal quality issues and no connection issues. (TT, Doc. 387, pp. 58-59).

**C.**    <u>**Statement of the Standard for the Scope of Review**</u>.

On appeal from a bench trial, there is a mixed standard of review. While the District Court's conclusions of law are reviewed *de novo*, its findings of fact may not be set aside unless clearly erroneous. <u>Compulife Software, Inc. v. Newman</u>, 111 F.4th 1147, 1155-56 (11th Cir. 2024). "In other words, reviewing a bench trial raises a mixed question of law and fact, and the relevant standard depends on whether answering it entails primarily legal or factual work." <u>Id</u>. (internal citation and punctuation omitted).

<u>**SUMMARY OF ARGUMENT**</u>

In order to determine whether there has been an effective prohibition of services in violation of the TCA, the District Court applied the "significant gap/least intrusive means" test to the evidence presented during the bench trial. The District Court erred in finding that T-Mobile had carried its burden of proving both prongs of this test.

The evidence presented did not demonstrate a gap in service in the particular area T-Mobile has designated as the alleged gap area, and given the size and nature of the area, the conclusion that any such gap is "significant" is erroneous. Secondly, evidence was presented that T-Mobile had options of fully optimizing the existing facilities and of utilizing its CellSpot devices to address any alleged gap. Both of these avenues would have no identifiable intrusion in the alleged gap area. Further, there was evidence that the proposed tower would not even provide full wireless services in the small alleged gap area. Accordingly, the Court's conclusion that the proposed tower was the least intrusive means of addressing the gap also is erroneous.

## ARGUMENT AND CITATIONS OF AUTHORITY

### A.    The District Court Erred in its Determination of a Significant Gap

To find a *prohibition* of services by denying the proposed tower, the evidence must show that there is *no coverage* without the tower. That is not the case here. Simply put, T-Mobile failed to objectively show a lack of coverage in the alleged gap area. Rather, the evidence makes clear that with this proposed tower, T-Mobile only seeks **better** coverage; it is not attempting to actually establish new service in the alleged gap area. It is undisputed that T-Mobile has coverage across its frequency bands in the subject area, so when the District Court found that there is a significant gap in coverage, it erroneously concluded that the law regarding prohibition of

11

services allows a carrier to arbitrarily set certain standards for what it unilaterally deems "acceptable" coverage and then to declare that those standards have not been met using data over which that carrier has exclusive control.  It is undisputed that T-Mobile provided no customer data and no actual data from the specific alleged gap area and instead relied exclusively on its own hired expert to extrapolate and analyze its own network data using its own set of standards.  Essentially, T-Mobile's presentation of evidence was that there is a gap in coverage, because T-Mobile says so.

When T-Mobile applied for this tower, it told the City that it needed it to fulfill customer needs, yet T-Mobile has not presented one single customer complaint about the lack of service in the subject area.  It is T-Mobile's position that such information is irrelevant, and only its extrapolation of network data should be considered.  However, T-Mobile has not cited one case construing the TCA where a court has blindly accepted a carrier's position of unilaterally establishing a set of goals and then accepting its statements that "we say we don't meet those goals, so we are entitled to build a tower."  T-Mobile has access to objective, location-specific data, yet it presented only its subjective analysis wherein the data it has selected (and which is in its exclusive control) is reviewed under its arbitrarily determined standards.  Not surprisingly, it then argues that the evidence shows there is a significant gap in

coverage.

If this "eye-of-the-beholder" approach were intended by the TCA, then a carrier could put a tower wherever it desired, without the need of requiring input from the community (or even its customer base), and the TCA would never need to address the role of the local government. That, in fact, is exactly the path chosen by the District Court where it erroneously disregarded the contrary opinions of the City's expert and relied exclusively on what T-Mobile presented about its own selected data not meeting its own designated set of standards.

"Standards of reliability invented by T-Mobile, customarily observed in the wireless service industry, or generally expected by consumers of wireless services do not constitute the standard for 'the provision of personal wireless services' protected under 47 U.S.C. § 332(c)(7)(B)(i)(II)." T-Mobile Northeast LLC v. Loudoun County Board of Supervisors, 903 F. Supp. 2d 385, 400-01 (E.D. Va. 2012), aff'd, 748 F.3d 185 (4th Cir. 2014). And just like the Fourth Circuit Court of Appeals has not directly resolved the question of precisely what minimum level of wireless service is adequate under subparagraph B(i)(II), (as pointed out in Loudoun), neither has the Eleventh Circuit.

This Court should maintain the objectivity of the significant gap analysis so as not to run afoul of the TCA's clear preservation of local authority. T-Mobile must be

13

required to carry a "heavy burden," Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 40 (1st Cir. 2014), to demonstrate that a significant gap in service exists in the alleged gap area through presentation of verifiable evidence gauged against reasonable standards of what levels of coverage are "acceptable." A gap in service means there is no service, and that gap must be significant in order to meet the TCA's prohibition provision. In the end, a prohibition of services is just that – preventing the provision of wireless coverage. In this case, T-Mobile failed to prove such a prohibition, and as such, the District Court erred in granting the injunction requiring the proposed tower.

A review of even a handful of cases addressing this issue makes clear that when determining whether there is a significant gap, there are no bright-line rules, and each case is to be considered on its own, taking into account a number of factors courts have identified such as physical size, nature, and character of the location, the number of affected customers, and dropped-call/failure rates. *See, e.g.,* Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 49 (1st Cir. 2009). Here, T-Mobile failed to provide the District Court sufficient evidence that objectively demonstrates a significant gap in order to meet its "heavy burden" of proof.

Throughout the history of this case, the alleged gap area has changed in size, although it is the same general location of a wooded, single-family residential

neighborhood with no major thoroughfares or heavily-traveled collector roads.  Using drive test data, T-Mobile presented the size of the purported gap relative to the frequency bands being used. Given the changed technology, in comparing T-Mobile's 2017 gap presentation to the 2024 presentation, only the 700 MHZ and 2100 MHZ were being used during both time periods.  In his 2017 report, Mr. Conroy reported the 2100 MHZ gap to be approximately 1.8 square miles, while the 2024 size is .9 square miles.  The 700 MHZ gap was reported in Mr. Conroy's 2017 report as .2 square miles, and in 2024, he reports it as .7 square miles.

The TCA does not guarantee every wireless carrier a right to seamless coverage in every area it serves, and the relevant service gap must be truly significant and not merely individual dead spots within a given area. *See, e.g.,* MetroPCS, Inc. v. City & County of San Francisco, 400 F.3d 715, 733, n.10 (9th Cir. 2005) (*abrogated on unrelated grounds by* T-Mobile South, LLC v. City of Roswell, Georgia, 574 U.S. 293, 299 (2015).  As the Second Circuit has noted, isolated "dead spots" or de minimis areas of non-coverage such as a limited number of houses do not amount to a significant gap.  Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 644 (2d Cir. 1999). "[A] significant gap must be large enough in terms of physical size and number of users affected to distinguish it from a mere, and statutorily permissible, dead spot. Indeed, federal regulations contemplate that areas enjoying adequate coverage will

still include spots without reliable service." <u>Green Mountain Realty Corp. v. Leonard</u>, 688 F.3d 40, 57-58 (1st Cir. 2012) (internal citation and punctuation omitted).

Here, the alleged gap area is a residential neighborhood less than a square mile, consisting of approximately 560 single-family homes with a total of 156 reported T-Mobile customers.  Given T-Mobile's nationwide customer base, the Lake Charles Drive area is so small that it likely would fit into the margin of error in the calculation of subscriber estimation.

It must be noted that Mr. Conroy did not testify that there is *no* coverage in the alleged gap area.  Rather, T-Mobile's position is that there is "unreliable service" in the alleged gap area that T-Mobile seeks to improve.  Mr. Conroy opined "unreliable service" is when (a) customers cannot place calls when they wish; (b) voice quality of a connected call does not meet customer expectations; and © a connected call drops or disconnects without notice.  However T-Mobile presented absolutely no customer data whatsoever.  Rather, Mr. Conroy arrived at his opinion by extrapolating from T-Mobile's selected network data and then gauging that against T-Mobile's designated design standards.  Mr. Conroy testified that it is possible to obtain location-specific and customer-based information, but that is not what he did in this case. Interestingly, T-Mobile did not conduct any in-building testing, even though its stated primary

16

objective is to provide in-building coverage.[2] Perhaps the motivation for not supplying actual customer/user or location-specific data is because that data would not show a lack of wireless service in the alleged gap area. Indeed, by not presenting this type of objective data that is specific to the alleged gap area, T-Mobile failed to meet its burden to show an actual gap in services in the actual area it identified as having a lack of reliable wireless service. *See, e.g.,* Vogue Tower Partners VII, LLC v. City of Elizabethton, Tennessee, ___ F. Supp. 3d ___, 2024 WL 4351425 (E.D. Tn. September 30, 2024) (carrier seeking to enhance and improve service failed to show actual significant gap where data indicated only possible problems).

Mr. Conroy confirmed that all of the major carriers were on the same existing towers, but no evidence was presented that the other carriers' customers in the alleged gap area were experiencing unreliable service. Also, no evidence was presented that T-Mobile currently is unable to compete in the Roswell wireless market due to the alleged service problems in the gap area. Instead, it is clear that T-Mobile merely seeks to enhance its service to this less-than-one square mile location. Given the small geographic area, it is not surprising that no evidence from the other carriers was

---

[2]Such readings are possible, as Mr. Conroy has provided data concerning T-Mobile in-building call rates in other cases. *See, e.g*, T-Mobile Northeast LLC v. Howard County Board of Appeals, No. CIV.A. RDB-11-729, 2012 WL 1123043, at *10 (D. Md. Mar. 30, 2012), *aff'd*, 524 F. App'x 9 (4th Cir. 2013).; Loudoun County Board of Supervisors, 903 F. Supp. 2d at 385.

presented.

"Whether a 'gap' constitutes a 'significant gap' depends not only upon its physical size, but also, and perhaps more significantly, upon the number of customers affected by that gap. Independent Wireless One Corp. v. Town of Charlotte, 242 F. Supp. 2d 409, 418 (D. Vt. 2003) (internal citation omitted); *see also* Powertel/Atlanta, Inc. v. City of Clarkston, No. 1:05–CV–3068, 2007 WL 2258720, at *6 (N.D.Ga. Aug.3, 2007) (assessing consumer data and looking at who in the area may be affected by the alleged lack of service); Omnipoint Holdings, 586 F.3d at 49 (court should consider physical size of gap, type of area of gap, the number of users the gap affects, and whether all of the carrier's users in that area are similarly affected); T-Mobile Northeast LLC v. Fairfax County Board of Supervisors, 672 F.3d 259, 277 (4th Cir. 2012) (same); Cellular South Real Estate, Inc. v. City of Mobile, Alabama, No. CV 15-00387-CG-B, 2016 WL 3746661, at *11 (S.D. Ala. July 8, 2016) (considering lack of customer testimony in finding no significant gap in service); Industrial Tower & Wireless, LLC v. Haddad, 109 F. Supp. 3d 284, 289 (D. Mass. 2015) (significant gap shown where Verizon Wireless provided evidence showing that Verizon customers experienced more service issues within the alleged gap area than in other areas of town); American Towers, Inc. v. Wilson County, No. 3:10-CV-1196, 2014 WL 28953, at *11 (M.D. Tenn. Jan. 2, 2014) (significant gap shown in part by submitted

18

reports of customer complaints); <u>Liberty Towers, LLC v. Zoning Hearing Board of Falls Township, Bucks County, Pennsylvania</u>, 2011 WL 6091081, at *8 (E.D.Pa. Dec. 6, 2011) (courts should examine a number of factors when determining whether a significant gap exists, including call drop or failure rates and the number of consumers affected by the gap); <u>Second Generation Properties v. Town of Pelham</u>, 313 F.3d 620, 631 (1st Cir. 2002) (gap will qualify as significant only if it "is large enough in terms of physical size and number of users affected to amount to an effective prohibition, rather than being a mere, and statutorily permissible, dead spot"). Here, we have no evidence presented about even one customer complaint, but even assuming a 20% problem with T-Mobile's 156 customers, that equates to 32 people. Using the same 20% number for the entire population of the alleged gap area, approximately 460 people in a city with a 92,000 population would allegedly be service having issues. That is a mere half of a percent (0.5%) of the City's population. By definition this less-than-one-square mile area that contains such a small percentage of population is a statutorily accepted "dead spot," not a significant gap.

Moreover, "[s]ince wireless services, unlike more traditional communications industries, are used while in transit, a gap that straddles a heavily traveled commuter thoroughfare would be more significant than a gap that affects a small residential cul-de-sac." <u>Independent Wireless One Corp.</u>, 242 F. Supp. 2d at 418 (internal

citation omitted).  Indeed, as the Tenth Circuit has observed:

> Another important, related consideration is whether a gap "straddles a significant commuter highway" or "a well-traveled road [that] could affect large numbers of travelers ... and the people who are trying to communicate with them." Cellular Telephone Co. v. Zoning Bd. of Adjustment, 197 F.3d 64, 70 n. 2 (3d Cir.1999). To be sure, isolated "dead spots" or de minimis areas of noncoverage do not amount to a significant gap; examples include "a small residential cul-de-sac," id., "the interior of buildings in a sparsely populated rural area," or "a limited number of houses or spots as the area covered by buildings increases," Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 644 (2d Cir. 1999).

AT & T Mobility Servs., LLC v. Village of Corrales, 642 F. App'x 886, 891 (10th Cir. 2016).  Here it is undisputed that this is a residential neighborhood where the travelers on the roads identified in the "gap polygons" are primarily the residents who live in the area.  There are no commute corridors or major highways.  *Cf.* Cellco Partnership v. White Deer Township Zoning Hearing Board, 609 F. Supp. 3d 331, 338 (M.D. Pa. 2022), *aff'd*, 74 F.4th 96 (3d Cir. 2023) (finding significant gap with evidence of "a four-mile stretch along I-80" where Verizon subscribers are likely to suffer dropped calls, garbled audio, a lack of data connectivity, and difficulty contacting emergency services.").

T-Mobile's position is that location-specific, customer-related information is irrelevant, because it is the state of its network that determines whether there is a

significant gap.  While the evidence showed that T-Mobile has coverage in the alleged gap area, Mr. Conroy testified that there is nevertheless a significant gap because of an alleged lack of signal strength and poor signal quality.  However, these are measured against standards subjectively set by T-Mobile from time to time, not an objective set of criteria.  Indeed, the other major carriers have standards that are different from T-Mobile's, and T-Mobile changed its own standards after it merged with Sprint.

Taking Mr. Conroy's testimony to its logical conclusion, only T-Mobile can decide if its own network is performing satisfactorily.  Certainly, if the data were to show a situation actually in the alleged gap area where there were consistently dropped calls or the constant inability to connect or download on a T-Mobile user's device, then objectively, the data would demonstrate that the system is not working without the proposed tower, and by denying the tower, there is a prohibition of service.  T-Mobile's evidence, however, showed that its network is not working *good enough*, a subjective analysis tested against T-Mobile's own performance goals, and not based on any customer complaints or location-specific data.

No evidence was submitted to explain how or why these particular goals were set or how or why T-Mobile's selected standards are actually required to provide service.  The goals and standards have not been shown to be based on anything

21

objective, nor has the evidence demonstrated that service below T-Mobile's selected standards is so bad as to be in reality no service at all such that there has been a prohibition of services.

The TCA specifically seeks to balance local governments' power regarding the placement of wireless service facilities with the carriers' need for providing wireless service using those facilities. 47 U.S.C. § 332(c)(7)(A)-(B). In that regard, the significant gap inquiry is meant to be an objective test. If the focus under this analysis were to be on whether the network is working good enough under a carrier's particularized set of standards instead of focusing on whether the network actually is working at all in the subject area, then a local government could not maintain any control whatsoever as specifically required by the TCA. Therefore, in order to determine whether there is a significant gap in this case, the District Court should have insisted on objective evidence specifically about the alleged gap area. Rather than doing so, the District Court improperly shifted the burden to the City to disprove T-Mobile's analysis of its own network using T-Mobile's designated design standards, and by determining the City's expert failed to do so, the District Court completely abandoned the objectivity of the significant gap test. Here, T-Mobile's proclaimed gap is in-building service, and the number of residences in the area is approximately 560 homes. Without any location-specific information or user device data, the District

22

Court erred in determining that there is unreliable service in the identified area.

## B.     The District Court Erred in Determining the Proposed Tower Was the Least Intrusive Means to Address any Alleged Gap in Service

In this case, the District Court has followed the Second, Third, and Ninth Circuits that require the carrier to show that the manner in which it proposes to fill the significant gap in service is the least intrusive. T-Mobile South, 662 F. Supp. 3d at 1276. While this Circuit has not made a determination of the test to be used in a TCA anti-prohibition case, as noted by the District Court, this standard is consistent with or complimentary to this Court's specification in Michael Linet, Inc. v. Village of Wellington, Florida that the carrier demonstrate "whether the company can reasonably place a cell site in an alternative location and eliminate the residents' concerns." 408 F.3d 757, 761-62 (11th Cir. 2005).

Under the least intrusive analysis, the carrier must prove that it made a good faith effort to identify and evaluate less intrusive alternatives such as alternative facilities, the use of existing structures, and alternative technologies. *See, e.g.,* Cellco Partnership v. White Deer Township Zoning Hearing Board, 74 F.4th 96, 101 (3d Cir. 2023). However, before this prong is even considered, T-Mobile must first show the existence of a significant gap in coverage. As set forth above, the District Court erred in finding a significant gap; therefore, it erred in concluding the proposed tower was

23

the least intrusive way to address it. *Assuming arguendo* that any such gap could be found, the District Court still erred in finding that T-Mobile carried its burden to show that the proposed tower is the least intrusive means of closing any alleged gap in service.

First, it must be noted that the District Court specifically made findings that the City failed to identify alternatives to the proposed tower. However, the City bears no burden in this action. Such a burden-shifting analysis has not been adopted in this Circuit and has specifically been rejected by other courts, as "such a standard improperly would create a presumption favoring the wireless industry over the interests of the local community, shifting the burden of production to the local governing body." T-Mobile Northeast LLC v. Fairfax County Board of Supervisors, 672 F.3d at 266 (citing 360° Communications Co. of Charlottesville v. Board of Supervisors of Albemarle County, 211 F.3d 79, 87 (4th Cir.2000)). Otherwise, such a finding was erroneous, as the City presented evidence of potentially available and feasible alternatives.

The initial question to be answered, however, is whether the proposed tower will, in fact, provide service to the purported gap. In this regard, T-Mobile presented projected modeling to show this, again using T-Mobile's selected levels. Importantly, even using those arbitrary standards, the projections demonstrate that the 108' tower,

24

placed right in the middle of the alleged gap area, will not provide 100% coverage to this small, less-than-a-square-mile area. While T-Mobile's projections show that the low band frequencies do reach 93% of the area, the mid band frequencies will not cover even half of this small alleged gap area. Otherwise, it is noteworthy that the propagation tool is controlled by Mr. Conroy and is based solely on data from T-Mobile.

This Circuit has not addressed when a local government may reject a proposed tower under the least intrusive means analysis, but in the Second Circuit, "a locality is permitted to deny an application for a wireless tower if it is possible for the applicant to 'select a less sensitive site, reduce the tower height, use a preexisting structure or camouflage the tower and/or antennae.'" Orange County– Poughkeepsie Ltd. Partnership v. Town of East Fishkill, 632 F. App'x 1, 3 (2d Cir. 2015) (citing Sprint Spectrum L.P. v. Willoth, 176 F.3d at 643 (internal punctuation omitted).

In looking at alternatives to the proposed site, first, the experts simply disagree as to whether a small cell/DAS node system like the one located in the subject area and currently being utilized by Verizon could work to provide coverage in the area. Second, the experts disagree as to whether optimization/adjustments of the existing sites, would provide better service in the area. Importantly, Mr. Conroy confirmed that incident to the Sprint merger, T-Mobile acquired a new tower. The evidence

presented was that this tower was simply integrated into T-Mobile's existing network. No evidence was presented that T-Mobile investigated or even considered utilizing this newly obtained tower, which is a mere 1.2 miles away, solely for the purpose of addressing the alleged gap area. According to Mr. Conroy, none of the existing towers could help, because "[t]hey need to be located in the gap to solve the gap." (TT, Doc. 386, p. 31). According to T-Mobile, these towers provide a limited range of coverage, and nothing can be done with them to assist with the alleged gap. Mr. Conroy noted that the existing towers are an average of 1.35 miles apart, so following his logic, we should be seeing cell towers all across the land about every 1.5 miles. Common sense and simple observations demonstrate that his "nothing can be done but build a new tower" theory is flawed. No evidence was presented that T-Mobile even bothered to take a hard look at the new Sprint tower to see if it could be used to remedy the gap by increasing the height; attaching bigger, better antennas; and/or optimizing the downtilt, azimuth, and power of the existing antennas. Mr. Conroy testified that good engineering practices would allow for significant changes to the antennas' downtilt and azimuths, yet that was never explored with this newly-acquired tower. Instead, *nothing* will satisfy T-Mobile except building the proposed tower.

Likewise, even though Mr. Conroy has done small cell and expert work for Verizon (TT, Doc. 384, pp. 21, 171), he never investigated the success or failure of

26

Verizon's small cells in the alleged gap area to determine if T-Mobile may be able to use them in a similar manner. Notably, the evidence was undisputed that T-Mobile co-locates on all of the same towers as Verizon and AT&T, yet neither of those carriers are alleging a significant gap in this area. Mr. Conroy testified that looking into that was not part of his job in this case (TT, Doc. 386, p. 112), so the evidence is clear that T-Mobile actually did not fully and in good-faith investigate alternatives to the proposed tower.

Finally, there is the matter of T-Mobile's CellSpot. T-Mobile's contract with the City to provide wireless services for City staff throughout the City included the provision and use of these devices, and evidence was presented that the CellSpot worked perfectly in the home of the assistant city manager. Testimony was presented that the alleged gap area had full internet access so that the Cellspot could communicate to T-Mobile's network. Yet, T-Mobile summarily dismissed the idea of using them in the alleged gap area to address the alleged service issues. Likewise, the District Court excluded them as a possible alternative, because the City failed to show that they would be sufficient to fill the alleged significant gap and because they required existing internet service. The District Court erroneously shifted the burden to the City, but given the documentary evidence of T-Mobile's reliance on the CellSpot all over the City and its success in doing so, the City met this burden.

27

Having a requirement of internet also was addressed in the testimony by showing full access in the alleged gap area. Finally the fact that additional services may be needed certainly should not form the basis of excluding this as an alternative, since testimony was presented that the proposed tower would need additional services as well, such as installation of fiber cable. (TT, Doc. 386, p. 136). As such, the District Court erred in determining that the tower was the least intrusive means of addressing the alleged gap.

## CONCLUSION

The District Court analyzed the evidence in this case under the significant gap/least intrusive test. T-Mobile has coverage in this small, less-than-a-square mile area and seeks only to improve service with the installation of the proposed tower. The District Court erred in relying exclusively on evidence of T-Mobile's network data gauged against arbitrary standards selected and set solely in the discretion of T-Mobile. In keeping with the goals of the TCA, the District Court should have insisted on objective, customer/user, location-specific data to determine whether a significant gap exists. Without such evidence, the best T-Mobile showed was that there might be a problem in the specific area identified as having a gap in service. The size, population, and character of the alleged gap area makes it insignificant rather than significant, assuming any gap was otherwise shown.

As for the least intrusive prong of the analysis, the District Court erred in shifting any burden to the City.  Further, the District Court erred in ignoring other possible, feasible alternatives to the proposed tower.  Given the nature of T-Mobile's own CellSpot and its successful use in the City, the District Court should have found that it was a better option of addressing any alleged gap in this case.

For all the reasons set forth herein, the City respectfully requests this Court reverse the District Court and find in favor of the City.

This 30th day of January, 2025.

CAROTHERS & MITCHELL, LLC

*/s/ Angela C. Couch*

_____

ANGELA C. COUCH
Georgia Bar No. 190005
Attorney for Appellant City of Roswell,
Georgia

1809 Buford Highway
Buford, GA  30518
(770) 932-3552
Email: angela.couch@carmitch.com

29

## Certificate of Compliance with Type-Volume Limit

1.    This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 32(a)(7)(b)(I) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6,972 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect in Times New Roman font size 14.

This 30th day of January, 2025.

CAROTHERS & MITCHELL, LLC

*/s/ Angela C. Couch*

_____
ANGELA C. COUCH
Georgia Bar No. 190005
Attorney for Appellant City of Roswell,
Georgia

1809 Buford Highway
Buford, GA  30518
(770) 932-3552
(770) 932-6348 Fax
Email: angela.couch@carmitch.com

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed the foregoing **BRIEF OF APPELLANT CITY OF ROSWELL, GEORGIA** with the Court using the CM/ECF system which will automatically send electronic mail notification of such filing to the below counsel of record:

Scott E. Taylor, Esq.
J. Tucker Barr, Esq.
Arnall, Golden, Gregory, LLP
171 17th Street, NW, Suite 2100
Atlanta, Georgia 30363
Scott.taylor@agg.com

T. Scott Thompson, Esq.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
sthompson@mintz.com

This 30th day of January, 2025.

CAROTHERS & MITCHELL, LLC

*/s/ Angela C. Couch*

_____
ANGELA C. COUCH
Georgia Bar No. 190005
Attorney for Appellant City of Roswell,
Georgia

1809 Buford Highway
Buford, GA  30518
(770) 932-3552
(770) 932-6348 Fax
Email: angela.couch@carmitch.com